JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

09  3342

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Solaris Health Systems, Inc.

## DEFENDANTS
Baxter International, Inc.; CSL Limited; and CSL Behring, LLC

(b) County of Residence of First Listed Plaintiff  Middlesex County, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Cook County, IL
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
The Haviland Law Firm, LLC, 111 S. Independence Mall East,
Suite 1000, Philadelphia, PA 19106 (215) 609-4661

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **PERSONAL INJURY** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 362 Personal Injury - Med. Malpractice | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 365 Personal Injury - Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | **PERSONAL PROPERTY** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 370 Other Fraud | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 371 Truth in Lending | ☐ 462 Naturalization Application |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 380 Other Personal Property Damage | ☐ 463 Habeas Corpus - Alien Detainee |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 385 Property Damage Product Liability | ☐ 465 Other Immigration Actions |  |  |
| **CIVIL RIGHTS** | **PRISONER PETITIONS** |  |  |  |
| ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence |  |  |  |
| ☐ 442 Employment | **Habeas Corpus:** |  |  |  |
| ☐ 443 Housing/ Accommodations | ☐ 530 General |  |  |  |
| ☐ 444 Welfare | ☐ 535 Death Penalty |  |  |  |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other |  |  |  |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights |  |  |  |
| ☐ 440 Other Civil Rights | ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. § 1 (Sherman Act); 15 U.S.C. § 26 (Clayton Act)
Brief description of cause:
Violations of the Sherman Act and Clayton Act

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $  exceeds $5,000,000
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE  7/24/09
SIGNATURE OF ATTORNEY OF RECORD   Donald Haviland / MSC

JUL 2 4 2009

FOR OFFICE USE ONLY

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

**BMS**

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM *to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.*

Address of Plaintiff: 80 James Street, Edison, New Jersey 08820

**09    3342**

Address of Defendant: Baxter International, Inc.: One Baxter Parkway, Deerfield, IL 60015; CSL Limited: 45 Poplar Rd., Parkville, Victoria, 3052, Australia, CSL Behring, LLC: 1020 First Ave, King of Prussia, PA 19406

Place of Accident, Incident or Transaction: in the district and throughout the country

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

  (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☑  No ☐

Does this case involve multidistrict litigation possibilities?    Yes ☑  No ☐
*RELATED CASE, IF ANY:*

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
    Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
    Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
    Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
    Yes ☐  No ☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☑ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify)

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, Donald E. Haviland, Jr. , counsel of record do hereby certify:

  ☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

  ☐ Relief other than monetary damages is sought.

DATE: 7/24/09 _____    _Donald Haviland /mjc_    666 15
                       Attorney-at-Law            Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 7/24/09 _____    _Donald Haviland /mjc_    66615  JUL 2 4 2009
                       Attorney-at-Law            Attorney I.D.#

CIV. 609 (6/08)

**APPENDIX I**

**BMS**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Solaris Health Systems, Inc. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | **09    3342** |
| Baxter International, Inc., CSL Limited, | : | |
| and CSL Behring, LLC | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)                                      (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.    ( )

| | | |
|---|---|---|
| **7/24/09** | **Donald E. Haviland, Jr.** | **Solaris Health Systems, Inc.** |
| **Date** | **Attorney-at-law** | **Attorney for** |
| | | |
| **215-609-4661** | **215-392-4400** | **Haviland@havilandlaw.com** |
| **Telephone** | **FAX Number** | **E-Mail Address** |

2009

(Civ. 660) 10/02

$350

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOLARIS HEALTH SYSTEMS,  :
on behalf itself and all other  :
similarly situated entities,  :      **Civil Action No.:**
                 Plaintiff  :
                            :
              v.            :      **09  344**
                            :      **CLASS ACTION COMPLAINT**
BAXTER INTERNATIONAL INC.,  :
CSL LIMITED; and            :      **JURY TRIAL DEMANDED**
CSL BEHRING, LLC            :
                 Defendants  :      **FILED**

JUL 2 4 2009

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

Solaris Health Systems, Inc. ("Solaris"), individually and on behalf of a class of all other

direct purchasers similarly situated, brings this action for declaratory injunctive relief, damages,

and/or restitution pursuant to the antitrust laws set forth below against CSL Limited, CSL

Behring LLC, and Baxter International Inc. (collectively, "Defendants").  Plaintiff alleges as

follows upon information and belief:

## NATURE OF THE ACTION

1.    This action arises out of a conspiracy among the leading manufacturers

of Plasma Derivative Products (as defined herein) to stabilize and restrict output and to fix,

raise, maintain, and/or stabilize prices for those products sold in the United States.  This action

follows the filing of a Complaint by the United States Federal Trade Commission against

Defendant CSL Limited, charging that its proposed acquisition of competitor Talecris

Biotherapeutics Holdings Corporation ("Talecris") from Cerberus-Plasma Holdings, LLC

("Cerberus") would "substantially lessen competition in the markets for several life-sustaining

1

plasma-derivative protein therapies." *See* Complaint filed by Federal Trade Commission at ¶1 (attached hereto and incorporated herein by reference thereto). Significantly, the federal government has charged that it has reason to believe that the effect of the proposed merger "will be further tightening of supply relative to demand and steeper price increases - potentially leaving critically ill patients without the treatments they need most." *Id.*

2.      As stated more fully below, Plaintiff alleges a conspiracy among Defendants and certain unnamed co-conspirators to restrict output and to fix, raise, maintain and/or stabilize prices for Plasma Derivative Products sold in, or sold for delivery in, the United States and its territories beginning in 2004 and continuing through the present. Such combination, conspiracy and agreement among Defendants violated Section 1 of the Sherman Act, 15 U.S.C.§1.

3.      As a result of Defendants' unlawful conduct, Plaintiff and the Class paid artificially inflated prices for Plasma Derivative Products and therefore have suffered injury to their businesses and property. Plaintiff and the Class seek damages and injunctive relief.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

5.      The Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

2

6.     Venue is proper in this District because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and ©, and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.

7.     The Court has personal jurisdiction over Defendants because they transact business in this District and throughout the United States, they sold Plasma Derivative Products in this District and throughout the United States, and they engaged in a fraudulent scheme and conspiracy to restrict output and fix prices that was directed at and had the intended effect of causing injury to persons and entities residing or located in, or doing business in, this District and throughout the United States.

## DEFINITIONS

8.     "Plasma Derivative Products" consist of the most prominent plasma-derivative proteins, including: (1) Ig; (2) albumin; (3) alpha-1; and (4) Rho-D. The relevant Plasma Derivative Products for purposes of this Complaint are Ig and albumin ("Plasma Derivative Products").

9.     The manufacturing process for Plasma Derivative Products involves: (1) plasma collection; (2) plasma testing; (3) fractionation (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.); (4) finishing or purification; (5) quality control; and (6) lot release. The time required to complete the full manufacturing process ranges from approximately seven months to one year.

10.     The manufacturing process is highly regulated because Plasma Derivative

3

Products run the risk of containing and transmitting infections. Regulatory bodies include the United States Food and Drug Administration ("FDA"), state regulatory agencies, and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

11. Plasma Derivative Products are essential for treating a number of serious illnesses, including immune deficiency diseases, coagulation disorders, respiratory diseases, and cancer. The annual cost for such treatments can exceed $90,000 per patient in some cases.

12. Purchasers of Plasma Derivative Products include hospitals and other health care facilities, like those that comprise the Solaris Health System. Purchasers of Plasma Derivative Products typically buy through contracts negotiated by group purchasing organizations ("GPDs") and will pay very high prices if necessary to make treatment available to critically ill patients. Consequently, small changes in production levels cause dramatic swings in prices for Plasma Derivative Products, and producers stand to increase profits greatly by controlling output relative to demand.

13. As used herein, the term "relevant time period" means the time period between 2004 to the present.

## PARTIES

### PLAINTIFF

14. Plaintiff, Solaris Health Systems, Inc. ("Solaris") is a health care network organized under the laws of the State of New Jersey, with its principal place of business located at 80 James Street, Edison, New Jersey. During the relevant time period, Plaintiff purchased Plasma Derivative Products from the Defendants. As a result of the conspiracy alleged, Plaintiff was injured in its business or property.

4

15.     Solaris is a New Jersey-based provider of a wide array of health and healthcare related services offered through an array of facilities, including an acute care hospital, inpatient and outpatient rehabilitation center, nursing and convalescent facilities, assisted living facilities and other specialized treatment programs.

16.     The Solaris organization includes the JFK Medical Center, the JFK Medical Center - Muhlenberg Campus, the JFK Johnson Rehabilitation Institute, the JFK Hartwyck Nursing, Convalescent & Rehabilitation Centers, and Whispering Knoll.

**DEFENDANTS**

17.     Defendant CSL Limited is a company incorporated and domiciled in Australia, with its principal place of business located at 45 Poplar Road, Parkville, Victoria, 3052, Australia. CSL Limited is the second-largest supplier of plasma-derivative protein therapies in the world. It produces and sells biotherapies indicated for the treatment of several rare primary immune deficiency diseases, coagulation disorders, and inherited respiratory disease. CSL Limited is a vertically integrated company. It owns and operates one of the world's largest plasma collection networks, CSL Plasma, with collection facilities and laboratories in Boca Raton, Florida and Marburg, Germany. It also owns and operates manufacturing sites, through its wholly owned subsidiaries, in Marburg, Germany and Bern, Switzerland. CSL Limited's worldwide sales for its 2008 fiscal year were about $2.5 billion.

18.     Defendant CSL Behring LLC is a wholly-owned U.S. subsidiary of CSL Limited and is headquartered at 1020 First Avenue, King of Prussia, Pennsylvania 19406-0901. CSL Behring is the second largest producer of plasma products in the United States. CSL Behring's products are indicated for the treatment of coagulation disorders including hemophilia and von

5

Willebrand disease, primary immune deficiencies, and inherited respiratory diseases. Its

products also are used in cardiac surgery, organ transplantation, burn treatment, and for the

prevention of hemolytic diseases in newborns. CSL Behring has a manufacturing site in

Kankakee, Illinois. CSL Behring's sales revenue was approximately $1.8 billion for its 2008

fiscal year.

19.     Defendant Baxter International Inc. is a global, diversified healthcare company

that incorporated in Delaware and has its principal place of business at One Baxter Parkway,

Deerfield, Illinois 60015. Baxter is the largest producer of plasma-derivative protein therapies in

the world, and is the largest producer of plasma products in the United States. Baxter is divided

into three business segments: Bio-Science, Medication Delivery, and Renal. The BioScience

business manufactures and sells, among other products, recombinant and plasma-based proteins

to treat hemophilia and other bleeding disorders, and plasma-based therapies to treat immune

deficiencies, alpha 1-antritrypsin deficiency, burns and shock, and other chronic and acute blood-

related conditions. Baxter maintains 15 manufacturing facilities in the United States and its

territories, as well as facilities in 23 other countries. Its BioScience segment has 11

manufacturing sites domestically and abroad, including sites in Hayward, Thousand Oaks, and

Los Angeles, California and in Beltsville, Maryland. In 2008, Baxter's revenues exceeded $12.3

billion, and it derives about 20% of its sales from plasma products.

## CO-CONSPIRATORS

20.     Whenever in this Complaint reference is made to any act, deed, or transaction of

any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

by or through its officers, directors, agents, employees, or representatives while they were

6

actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

21.    The acts alleged in this Complaint to have been done by Defendants were authorized, ordered, and condoned by their parent corporations and authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control or transaction of their business affairs.

22.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name such persons or entities in the future.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class (the "Class"):

> All persons and/or entities in the United States who purchased Plasma Derivative Products directly from any Defendant, at any time during the period from 2004 to the present. Excluded from the Class are Defendants, their co-conspirators, all present and former parents, predecessors, subsidiaries or affiliates of Defendants, and all governmental entities.

24.    Due to the nature of the trade and commerce involved, Plaintiff believes that Class members number in the thousands throughout the country, and thus are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff.

25.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in

violation of the antitrust laws in that they paid artificially inflated prices for Plasma Derivative Products purchased directly from Defendants or their co-conspirators. Therefore, Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class in that it has no interests that are antagonistic to other members of the Class and it has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Such common questions of law and fact include:

a.     Whether Defendants and their co-conspirators engaged in a conspiracy to restrict output and to fix, raise, maintain, or stabilize the price of Plasma Derivative Products sold in the United States;

b.     Whether Defendants' combination or conspiracy caused output to be restricted or prices for Plasma Derivative Products to be higher than they would have been in the absence of Defendants' conduct;

c.     Whether Defendants' combination or conspiracy caused injury to the businesses or property of Plaintiff and the other members of the Class;

d.     Whether Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in Count 1;

e.     The appropriate class-wide measure of damages; and

f.     The appropriate nature of class-wide equitable relief.

28.     Plaintiff knows of no difficulty that would prevent this case from being maintained as a class action. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Class action treatment will, among other things, allow a large number of similarly situated persons and/or entities to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require. Moreover class action treatment allows injured persons the ability to seek redress on claims that might be impracticable to pursue individually.

29.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for Defendants.

30.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. It is believed that Defendants maintain computerized information that would enable them to calculate amounts paid by the Class for Plasma-Derivative Products, aiding in the management of this litigation as a class action.

31.     Defendants have acted, and/or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

32.     In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

9

## INTERSTATE TRADE AND COMMERCE

### Relevant Product Markets

#### Ig

33.    Ig is a widely used drug that can be administered intravenously ("IVIG") or subcutaneously ("SCIG"). IVIG, the more predominant form, has over 20 FDA-approved indications, and as many as 150 off-label uses. Ig products are antibody-rich plasma therapies that long have been used in the treatment of primary immune deficiencies (to provide antibodies a patient is unable to make) and certain autoimmune disorders where it is believed to act as an immune modulator. In addition, physicians frequently prescribe Ig for a wide variety of diseases, although these uses are not described in the product's labeling and differ from those tested in clinical studies and approved by the FDA or other regulatory agencies in other countries. These unapproved, or "off-label," uses constitute the preferred standard of care or treatment of last resort for many patients in varied circumstances.

34.    Ig represents the largest plasma-derived protein product by value. It is estimated that 70% of IVIG sold in the United States in 2007 was purchased by hospitals through contracts negotiated with GPOs. Physician offices represented about 13% of IGIV volume, and homecare companies and specialty pharmacies represented about 17% of IGIV volume.

35.    Ig constitutes a relevant product market.

36.    There are no good substitutes for Ig.

#### Albumin

37.    Albumin is the most abundant protein in human plasma. It is synthesized by the liver and performs multiple functions, including the transport of many small molecules in the

10

blood and the binding of toxins and heavy metals, which prevents damage that they otherwise might cause. Albumin is used to expand blood volume and to prime heart values during surgery.

38.    Albumin generally is used in surgical and trauma settings and typically is sold to hospital groups.

39.    Albumin constitutes a relevant product market.

40.    There are no good substitutes for albumin. Physicians and hospitals regard albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

### Relevant Geographic Market

41.    The relevant geographic market is the United States.

42.    Like pharmaceutical products, each Plasma-Derivative Product must be approved for sale in the United States by the FDA. To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA. The products also must be manufactured at plants approved by the FDA.

43.    Performing the requisite clinical trials and undergoing the FDA approval process for plasma and plasma-derivative proteins, including Plasma-Derivative Products, takes well over two years. Accordingly, Plasma-Derivative Products sold outside of the United States are not viable competitive alternatives for United States customers, who cannot buy these products even in the event of a price increase for products available in the United States.

### Market Characteristics

44.    The structure and characteristics of the Plasma-Derivative Product markets in the United States are particularly conducive to a price-fixing agreement, and have made collusion

11

particularly attractive in this market.  These factors are discussed below.

## Commodity-Like Products

45.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers both to agree on the prices for the product and to monitor these prices.

46.    Plasma-Derivative Products are homogeneous, commodity-like products within a given product category (e.g., Albumin or Ig) and one Defendant's Plasma-Derivative Product easily can be substituted for a Plasma-Derivative Product made by the other Defendant.  Indeed, Talecris, a competitor of Defendants, noted in a 2008 SEC filing that "[a]mong albumin products, competition is generally based on price, given that the products tend to be homogeneous."

47.    Because Plasma-Derivative Products are commodity-like products, purchasers make purchase decisions based predominantly, if not entirely, on price.

## Lack of Substitutes

48.    The lack of available substitutes for a product also helps facilitate an effective price-fixing conspiracy.  Without substitutes, producers of the product can raise prices without losing significant sales to closely competing products.

49.    For hospitals, physicians, and others that use Plasma-Derivative Products, there simply are no suitable substitutes for these products, at any price.  They must purchase Plasma-Derivative Products regardless of the price; nothing else will do.  Indeed, as Patrick Robert of the Marketing Research Bureau Inc. has noted, "therapeutic plasma proteins [including Plasma-

Derivative Products] remain essential life-saving drugs for which there is still no competitive drug."

<b>Industry Concentration</b>

50.    A high degree of concentration facilitates coordination among co-conspirators.

51.    Defendants control a high percentage of the United States plasma-derivative protein industry, collectively possessing about a 60% market share.  In particular, Baxter controls about 36% of the market, and CSL controls about 24% of the market.  The remaining manufacturers, Talecris, Grifols USA ("Grifols"), and Octapharma USA, Inc. ("Octapharma"), possess shares of approximately 23%, 7% and 5%, respectively.

52.    With respect to the domestic Ig market, according to 2008 sales volumes, Defendants collectively possess approximately a 62.9% market share.  CSL has about a 27.5% market share, and Baxter has about a 35.4% market share.  The remaining manufacturers, Talecris, Grifols, and Octapharma, possess shares of approximately 20%, 9% and 7.2%, respectively.  The market is highly concentrated, with a Herfindahl-Hirschman Index ("HHI") of 2,579.  (The HHI test is used by the FTC and DOJ to gauge market concentration.  An industry with an HHI exceeding 1,800 is deemed "highly concentrated.")

53.    With respect to the domestic albumin market, according to 2008 sales volumes, Defendants collectively possess approximately a 73.05% market share.  CSL possesses about a 36.61% market share, and Baxter maintains about a 36.44% share.  The remaining competitors, Talecris, Grifols, and Octapharma, possess shares of 8.83%, 13.06%, and 5.07% respectively.  The market is highly concentrated, with an HHI of 2,942.

54.    Throughout the Class Period, Defendants collectively possessed market power to

13

raise prices above competitive levels in the Plasma-Derivative Products markets in the United States without losing appreciable market share to non-co-conspirators.

### Barriers to Entry

55.    The presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

56.    The market for Plasma-Derivative Products is characterized by high entry barriers. Indeed, no firm has entered *de novo* in recent history, and prospective entrants have little chance of making a meaningful market impact in a timely fashion.

57.    Each step of the manufacturing process for Plasma-Derivative Products involves substantial up-front, sunk costs, onerous and lengthy regulatory approvals by federal and state agencies, and specialized technical know-how and expertise.

58.    Regulatory hurdles impose significant barriers to entry and extend the time it would take to enter the United States markets, let alone make a significant impact in the markets.

59.    In addition, the construction and maintenance of production facilities, including regular improvements necessitated by evolving standards of manufacturing practices, requires extensive capital expenditures and may involve long lead times to obtain the necessary governmental approval.

60.    Any new competitors in the United States also would need to secure an adequate supply of domestic plasma because only plasma collected in the United States is certified for use in products sold domestically.  Because there currently are only a very limited number of independent plasma suppliers, most of whose plasma collection and center development capacity

14

is already contracted to existing manufacturers, any new competitor likely would have to develop its own domestic-based plasma collection centers and related infrastructure.

### Demand Inelasticity

61.     Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue. Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

62.     The demand for Plasma-Derivative Products is highly inelastic. Plasma-Derivative Products are considered medical necessities that must be purchased by hospitals, physicians, and others at whatever the cost. Moreover, there are no close substitutes for these products.

63.     Defendants are members of trade associations and regularly attend meetings together.

64.     For example, Defendants are members of the Plasma Protein Therapeutics Association ("PPTA"). The PPTA is "the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics." Defendants are Global, North American, and European Members of the association, and their high-level executives, including Peter Turner, President of CSL Behring, and Larry Guiheen, President of Baxter BioScience, serve on the association's Global Board of Directors. Mr. Turner also serves as the association's president. The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level

15

executives from Defendants, such as Messrs. Turner and Guiheen, routinely attend.

65.    Such trade association meetings provide the opportunity for participants in price-fixing conspiracies such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

## Market Dynamics During Late 1990's-Early 2000's

66.    In the late 1990's, a series of events brought about by temporary plant closures, following FDA intervention, resulted in extensive change in supply for both the domestic and global plasma-derivative protein products industries.

67.    In 1997, in the wake of a recall of albumin produced by a company called Centeon, the FDA mandated the temporary closure of the plant then owned by Centeon at Kankakee, Illinois (which CSL Limited now owns). In 1999, the Alpha Therapeutic Corporation plant in Los Angeles, California (which CSL Limited also now owns) was temporarily closed. The shortages that resulted from these disruptions, particularly concerning Ig supply, caused higher prices in the United States market, spurring producers to increase plasma collections as well as output of Plasma-Derivative Products.

68.    Between 2000 and 2003, however, once the Kankakee and Los Angeles facilities had recommenced production, there was an oversupply of Plasma-Derivative Products. This led to dramatic price declines and, in turn, to a 30% reduction in gross operating margins among producers. Due to fixed costs representing a high proportion of the total costs of Plasma-Derivative Products production, this translated into a significant downturn in profits for the industry.

16

69.    This period of excess supply, in turn, resulted in another significant change in the industry, causing the remaining producers to reduce production and plasma collection capacity and to begin in earnest to vertically integrate.

**Industry Consolidation**

70.    In 1990, there were 13 producers of plasma-derivative protein products. In 2003, that number dropped to nine. Since 2005, there have been only five: CSL, Baxter, Talecris, Grifols, and Octapharma.

71.    Several firms recently merged or were acquired. The large, integrated suppliers, most notably Defendants, have acquired numerous independent plasma collectors and facilities, and continue to do so. And soon after acquiring them, Defendants shut down many of them.

72.    CSL Limited acquired the Swiss Red Cross fractionator, ZLB, as well as 47 plasma collection centers from Nabi, in July 2000. It acquired Aventis Behring's plasma products business in 2003. CSL Limited subsequently closed 35 plasma collection centers in the United States, reduced plasma collections by 1 million liters, and reduced plant output by 1.1 million liters.

73.    Baxter acquired 42 plasma collection centers and a laboratory from Alpha Therapeutic Corporation (Mitsubishi Pharma) in late 2002. Baxter subsequently closed 26 of its own plasma collection centers and 38 collection centers that it acquired from Alpha Therapeutic, as well as a plant in Rochester, Michigan.

74.    As one investment firm with knowledge of the industry has noted, "[a]bout 80% of the [plasma collection] centers are now owned by plasma-products companies such as Baxter International, CSL Limited, Grifols, and Talecris Biotherapeutics. This represents a complete

17

reversal in ownership since 2000, when 80% of the centers were independent enterprises."

75.     In 2005, a major non-profit entity, the American Red Cross, exited the plasma products industry.

76.     The plasma products industry as it now exists has significantly fewer suppliers than it did even six years ago.  The remaining suppliers, most notably among them Defendants, are larger and more vertically integrated than even before.

### THE CONSPIRACY

77.     As consolidation has occurred in the plasma-derivative protein products industry, supply has been limited in the face of increasing demand, and prices consequently have increased in recent years.  GPOs, hospitals, physicians -- and ultimately patients -- have experienced tightening supplies and rising prices. The restriction of supply and increase in prices for Plasma-Derivative Products began by at least 2005 and has continued through the present.

78.     The restriction of supply and increase in prices was not the result of natural market forces. Rather, they were caused by Defendants' conspiracy, which Defendants formed in response to the excess supply that occurred earlier in the decade and that Defendants did not want to experience again.

79.     Indeed, Baxter explained in a recent investor call how competitors have "*lived through the events of the early 2000's,*" referring to the period of excess supply and lower prices, and now have returned to a time of "very good stock prices and very good returns for shareholders."  Similarly, at the 2007 Plasma Protein Forum, held June 5-6 at the Hyatt Regency in Reston, Virginia and attended by numerous industry executives, including those of Defendants, Peter Turner, PPTA Chairman and President of CSL Behring, "declared *the industry*

*to be in 'good shape' after a few bumps in the road in years past."*

80.    Defendants implemented their illegal agreement by coordinating and restricting output and by signaling to one another and to other competitors to do the same. Indeed, during and after the period of excess capacity earlier in the decade, Defendants recognized that controlling capacity was critical to preventing price competition.

81.    A key element of the conspiracy was Defendants' focus on the prevention of oversupply of Plasma-Derivative Products and plasma in the marketplace. For example, Baxter has recognized that as long as competitors are not *"irrational"* and do not *trash price and take share,"* then they can increase supply steadily in line with market demand to keep prices high.

82.    Competitive information is widely available from industry sources and the competitors themselves. Firms closely monitor each others' activities with respect to plasma collection, manufacturing, and output, and firms collect and catalogue an extraordinary wealth of timely competitive information.

83.    Defendants have taken advantage of this timely competitive information not only by monitoring their competitors' activities, but also by engaging in signaling – *i.e.,* the intentional sharing of competitive information for purposes of seeking to ensure that manufacturers all are restraining output, curbing growth, and maintaining high prices.

84.    In particular, Defendants have used specific key words to: (1) suggest to each other that increasing the production of Plasma-Derivative Products could hurt the firms' ability to reap significant profits that they all gained during an extended period where demand exceeded supply for these products; (2) remind each other of how, during a period when supply increased, prices and profitability for firms dropped substantially; and (3) encourage one another to increase

19

supply only incrementally to keep pace with demand, and not increase supply to the extent the firms actually compete with one another for market share.

85.    Baxter's CFO acknowledged Defendants' signaling in a recent investor call: "Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamic], I just don't see why we would. It wouldn't make any sense and *from everything we read and all the signals we get, there is nothing that says anyone would do that. I think people are very consistent in the messages they deliver, which are pretty consistent with what we have told you today.*"

86.    Another aspect of the conspiracy was the rationing of supply to purchasers. In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were experiencing problems purchasing Ig. HHS States that Ig "*[m]anufacturers are currently allocating IGIV to their customers. Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations. In economic terms, current IGIV supplies are being rationed.*" HHS also noted that "[t]he existence of the secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply." HHS concluded that a majority of hospitals surveyed could not purchase enough IGIV to meet all of their patient needs, and calculated that the shortfall of supply relative to demand was approximately 14%.

87.    Defendants have explored means of punishing firms, most notably Talecris, that have attempted to buck the prevailing restrained industry approach by increasing output.

88.    Talecris is the one firm in the industry that potentially could thwart the prevailing

restrained approach that Defendants successfully have advocated and implemented thus far. Indeed, according to the FTC, Talecris is "the one firm that has consistently and significantly expanded output in the United States." Moreover, Talecris recently stated in a 2008 SEC filing that it "intend[s] to serve the overall market growth with incremental increases in production capacity" in 2008 and 2009.

89.     In a further attempt to reduce industry production capacity and maintain high prices and margins, CSL Limited recently attempted to acquire Talecris. In an unusual move for a company whose competitor was contemplating a key acquisition, Baxter publicly expressed its view that CSL Limited's attempted acquisition of Talecris would be "*a positive stabilizing move within the industry.*" The FTC subsequently sought to block the attempted acquisition. (The FTC action is discuss in depth below and the FTC Complaint is attached hereto and incorporated herein by reference thereto.)

90.     Defendants' agreement to restrict supply and raise prices has been assisted by increased industry consolidation and the resulting oligopolistic market structure. The remaining participants have recognized that they are operating in an oligopoly where they are better off avoiding competition, restricting supply, and raising prices.

91.     The average sales price for a gram of IVIG has increased from about $47.60 in 2005 to about $57 in 2009, according to an analyst presentation that Grifols gave on March 5, 2008. The same presentation stated that "IVIG, which remains the driver of the plasma derivatives market, has witnessed price increases since 2005, coinciding with increased demand related to product availability."

92.     The average sales price for a gram of albumin has increased from about $1.25 in

2005 to about $2.20, according to the same Grifols presentation. The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. via at present." A Talecris 2008 SEC filing similarly notes that "[p]rices for albumin have increased significantly since 2005....The average selling price in 2007 was $28.55, having grown at a CAGR of 35% since 2005, when the U.S. average selling price (ASP) was $15.58."

93.    Defendants contemporaneous business reports have borne out these facts. For example, CSL Limited reported in its October 2004 Annual General Meeting presentation: "IVIG - prices have been stable with upward pressure going forward; currently experiencing solid demand;" and "Albumin - prices stable after period of weakness; inventory oversupply reducing." In its October 2005 Annual General Meeting presentation, CSL Limited remarked that "US IVIG pricing environment improving," and that with respect to the CSL Behring, it is "managing plasma throughput to match: run down in inventory benefit; reduction of inventory levels'; [and] demand." The Chairman's Address from the same 2005 meeting stated that CSL "Behring is well positioned to develop its global business through," among other things, "an effective balance between supply and demand." And in its October 2006 Annual General Meeting presentation, CSL Limited noted both that the "strong global demand for plasma therapies continues," and "plasma sector stability."

94.    Defendants' conspiracy has resulted not only in supra-competitive pricing, but also extraordinary profits for Defendants, even as most other industries have experienced drastically lowered earnings in the face of the global economic crisis.

95.    According to a March 2009 report issued by CSL's chairman, CSL experienced a

post-tax net profit of $502 million for the half-year ended December 31, 2008, an increase of 44% from the same period last year. The report also notes that "[t]he global financial crisis has had little to no impact so far on sales of CSL's portfolio of life-saving therapies and essential vaccines....[a]nd we anticipate broadly stable market conditions to continue."

96.    CSL Behring sales revenue increased 33% to $1.8 billion compared with the same period the previous year, "with strong contributions from both core and specialty plasma products," according to the same March 2009 CSL report.

97.    Revenues from Baxter's BioScience unit climbed 12% to $1.36 billion in 2008, largely pursuant to sales of plasma-based hemophilia and immune disorder treatments, vaccines and biosurgery products. Due to the profit its BioScience unit has generated, one news article has noted that "Baxter is one of a handful of stocks that have proven somewhat resistance to the local recession."

## FTC INVESTIGATION

98.    On March 27, 2009, the FTC authorized a lawsuit to block CSL Limited's proposed $3.1 billion acquisition of Talecris, charging that the deal would be illegal and substantially would reduce competition in the United States markets for Ig, albumin, Rho-D, and Alpha-1. On the same date, the FTC also sought a preliminary injunction in federal district court in the District of Columbia to stop the transaction pending completion of an administrative trial.

99.    In an FTC press release accompanying the filing of the lawsuit, Richard Feinstein, Director of the FTC's Bureau of Competition, stated that "[s]ubstantial consolidation has already occurred in the plasma protein industry, and *these highly concentrated markets are already exhibiting troubling signs of coordinated behavior.*"

23

100.    The FTC described in its Complaint, among other things, *"troubling signs of coordinated behavior,"* including Defendants' signaling, product rationing, and other public statements and actions indicative of anti-competitive conduct.

101.    The FTC alleged that, "with the elimination of Talecris - the one firm that has consistently and significantly expanded output in the United States - *CSL and Baxter International, Inc. ("Baxter") would face no remaining significant obstacle in their efforts to coordinate the tighten supply conditions* for the relevant products, to the great detriment of consumers."

102.    Notably, numerous sentences and parts of sentences from the FTC complaint have been redacted from public viewing. The FTC has moved to file an unredacted version of the complaint.

103.    The FTC has stated that the redacted "language suggests a *strong possibility of ongoing coordinated interaction between firms in the plasma industry.* Evidence of transparency, interdependence, and signaling among firms is particularly relevant to the allegations in this matter. The language at issue bears on these very important points, and demonstrates how firms used specific key words to:

- suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share."

24

104.    The FTC also has noted that the redacted *"quoted language. . . .is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy. See, e.g., In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (Referring to competitor as a 'friendly competitor,' mentioning an 'understanding between the companies that. . .causes [them] not to . . .make irrational decision,' and querying whether competitors 'will play by the rules (discipline)' can all be evidence of an explicit agreement to fix prices)."

105.    CSL Limited has opposed the FTC's motion to file an unredacted version of the complaint, claiming that every quote in the complaint derived from the respondents' documents constitutes confidential business information, and that disclosure of this information irreparably would harm their reputations.  The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material would cause *"embarrassment"* and *"could 'expose respondent to possible treble damages.'"* Those reasons are not sufficient to prevent disclosure.

106.    Shortly after the filing of the FTC complaint, on June 8, 2009, CSL Limited and Talecris publicly announced that they would abandon the proposed merger.  On June 15, 2009, the FTC and the two firms jointly filed a motion to dismiss the FTC's complaint on that basis, and on June 22, 2009, the FTC dismissed the complaint.

107.    There has been no ruling yet on the FTC's motion to file an unredacted version of the complaint.  Significantly, the FTC has not abandoned its position, believing that the public interest would best be served by full disclosure of the redacted language.

25

## ANTITRUST VIOLATIONS

108.    Beginning at least as early as 2004, and continuing through the present, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restrained of trade to restrict output and to artificially raise, fix, maintain or stabilize the prices of Plasma-Derivative Products in the United States.

109.    Based on the foregoing, and on information and belief, in formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrict output and to artificially raise, fix, maintain, or stabilize the price of Plasma-Derivative Products sold in the U.S. These activities include:

(a)    Defendants participating in conversations or communications to discuss the supply and price of Plasma-Derivative Products in the United States;

(b)    Defendants agreeing during those conversations or communications to restrict output and to charge prices at specific levels and otherwise to increase or maintain prices of Plasma-Derivative Products sold in the United States; and

©    Defendants agreeing during those conversations or communications to restrict output and to fix or stabilize prices of Plasma-Derivative Products sold in the United States; and

110.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

111.    Throughout the Class Period, Plaintiff and the other Class members purchased Plasma-Derivative Products from Defendants (or their subsidiaries or controlled affiliates) or

26

their co-conspirators at supra-competitive prices.

112.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

## EFFECTS OF THE CONSPIRACY

113.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their businesses and property because they have paid more for Plasma-Derivative Products than they would have paid in a competitive market.

114.    The unlawful contract, combination or conspiracy has had at least the following effects:

a.    price competition in the markets for Plasma-Derivative Products has been artificially restrained;

b.    prices for Plasma-Derivative Products sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.    purchasers of Plasma-Derivative Products from Defendants have been deprived of the benefit of free and open competition in the Plasma-Derivative Product markets.

## FRAUDULENT CONCEALMENT

115.    Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until May 27, 2009, when the FTC's redacted Complaint was filed.

116.    Because Defendants' alleged conspiracy was kept secret until May 27, 2009, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful

27

conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Plasma-Derivative Products throughout the United States during the Class Period.

117.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

118.    By their very nature, Defendants' conspiracy was inherently self-concealing. Plasma-Derivative Products are not exempt from antitrust regulation, and thus, before May 27, 2009, Plaintiff reasonably considered it to be a well-regulated, competitive industry.

119.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' preferred Plasma-Derivative Products prices before May 27, 2009.

120.    Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

121.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until May 27, 2009, when

the FTC Complaint, and its corresponding factual allegations of anti-competitive conduct concerning Plasma-Derivative Products, was first publicly disseminated.

122.    None of the facts or information available to Plaintiff and members of the Class prior to May 27, 2009, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

123.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

124.    Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Plasma-Derivative Products, which they affirmatively concealed, at least in the following respects:

      a.    By communicating secretly to discuss outpatient and prices of Plasma-Derivative Products in the United States; and

      b.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

125.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Class' claims have been tolled.

## VIOLATIONS ALLEGED

### Violation of Section 1 of the Sherman Antitrust Act and Section 16 of the Clayton Act

126.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

29

127. Beginning at a date unknown to Plaintiff, but no later than 2004, and continuing through to the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices for Plasma Derivative Products paid by Plaintiff and the other Class members in violation of Section 1 of the Sherman Act, 15 U.S.C.§ 1. Such a contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

128. As a result of their unlawful actions, Defendants were able to force coordinated price increases on the United States Plasma-Derivative Product markets.

129. Defendants' unlawful conduct took many forms, including but not limited to:

a.    Attending meetings and/or otherwise exchanging information regarding the pricing and sale of Plasma Derivative Products.

b.    Agreeing to sell Plasma Derivative Products at specific, pre-arranged prices;

c.    Agreeing not to compete for each other's customers;

d.    Announcing price increases for Plasma Derivative Products at or near the same times;

e.    Implementing price increases for Plasma Derivative Products in the same or similar amounts and at or near the same times;

f.    Selling Plasma Derivative Products to customers at collusive and non-competitive prices;

g.    Giving actual and/or apparent authority to employees' participation in

30

furtherance of the wrongful conduct; and

      h.     Fraudulently concealing the wrongful conduct.

130.    Defendants' wrongful conduct in manipulating prices was undertaken in order to charge artificially inflated prices for their Plasma Derivative Products.

131.    As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination, or conspiracy, Plaintiff and other members of the Class have been injured in their businesses or property in that they have paid more for Plasma Derivative Products than they would have paid in the absence of Defendants' and their co-conspirators' price fixing.

132.    These violations are continuing and will continue unless enjoined by this Court.

133.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## DAMAGES

134.    During the Class Period, Plaintiff and the other members of the class purchased Plasma Derivative Products, and by reason of the anti-competitive conduct herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a result, Plaintiff and the other members of the Class have sustained damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

135.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

31

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.     That the Court determine that the claims alleged herein under the Sherman Act may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

      I.     violation of the Sherman Act, 15 U.S.C. §§ 1, as alleged herein;

C.     That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition;

D.     That Plaintiff and Class members be awarded pre-judgment and post-judgment interest as permitted by law;

E.     That Plaintiff and Class members recover their costs of suit, including reasonable attorneys' fees as provided by law; and

F.     That Plaintiff and Class members be awarded such other and further relief as may be necessary and appropriate.

32

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Constitution of the United States, Plaintiff demands a trial by jury of all issues so triable.

Date: July 24, 2009

Respectively submitted,

Donald E. Haviland, Jr., Esquire
Robert G. Hughes, Esquire
Michael J. Lorusso, Esquire
**THE HAVILAND LAW FIRM, LLC**
111 S. Independence Mall East, Suite 1000
Philadelphia, PA 19106
Telephone: 215-609-4661
Facsimile: 215-392-4400
Haviland@havilandlaw.com
Hughes@havilandlaw.com
Lorusso@havilandlaw.com

Barry R. Eichen, Esquire*
William O. Crutchlow, Esquire*
Christian R. Mastondrea, Esquire*
**EICHEN, LEVINSON & CRUTCHLOW**
40 Ethel Road
Edison, NJ 08817
Telephone: 732-777-0100
Facsimile: 732-248-8273
Beichen@eichenlevinson.com
Wcrutchlow@eichenlevinson.com
Cmastondrea@eichenlevinson.com
(*pro hac vice applications pending)

Counsel for Solaris Health Systems, Inc.
And the Class

33